IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WOUND CARE CENTERS, INC., DIVERSIFIED CLINICAL SERVICES, INC., Plaintiffs, <br><br> v. <br><br> DAVID CATALANE, RODNEY KOSANOVICH, PHILIP GEORGEVICH, PAUL WILLIS, RICK SCANLAN, ROBERT YELLENIK, SAMINA NASEER, VIDHU SHARMA, OHIO VALLEY GENERAL HOSPITAL, <br><br> Defendants. | CIVIL ACTION NO.   10-336 |

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge

I.    **Introduction**

Pending before the court is the motion for a preliminary injunction ("Motion") (ECF No. 3) filed by plaintiffs Wound Care Centers, Inc., ("WCCI") and Diversified Clinical Services, Inc. ("Diversified" and together with WCCI, "WCCS" or "plaintiffs")[1], against defendants David Catlane ("Cataline"), Rodney Kosanovich ("Kosanovich"), Philip Georgevich ("Georgevich"), Paul Willis ("Willis"), Rick Scanlan ("Scanlon"), Robert Yellenik ("Yellinik"), Samina Naseer ("Naseer"), and Vidhu Sharma ("Sharma" and together with the other named individual

---

[1] The evidence adduced was not sufficient for the court to discern the exact relationship between WCCI and Diversified and which entity is bound to the covenants in issue before the court.  Plaintiffs represent that WCCI was formerly known as Curative Health Services, which was formerly known as Curative Technologies, Inc. and that WCCI and Diversified are commonly owned and conduct business together.  (Compl. ¶ 3.)  Plaintiffs refer to themselves collectively as "WCCS."  For ease of reference, the court will refer individually and collectively to either plaintiff and any predecessor of either plaintiff as  "WCCS".  In many documents, WCCS is represented as the party of interest.  Where the original document clearly identified a specific party different than WCCS, the court will insert WCCS in brackets, i.e., [WCCS].

defendants, the "physician defendants")[2], and Ohio Valley General Hospital ("OVGH" and collectively with the physician defendants, "defendants").

With respect to the physician defendants, plaintiffs request the court to enjoin each of them: 1) for a period of one year and within twenty miles of OVGH from: a) establishing, operating, contracting with or entering into any business relationship with a facility or company which has as its primary business the treatment of chronic non-healing wounds, b) employing, hiring, or contracting for services with any employee or former employee of WCCS, and c) exchanging or contracting with any person or entity to provide, or contracting with any competitor of WCCS that provides comprehensive wound care management services of the kind provided by WCCS; and 2) from disclosing, publishing, or disseminating confidential information as defined in the relevant physician affiliation agreements ("PAAs").

With respect to OVGH, plaintiffs request the court to enjoin it from: 1) employing any physician defendant directly or through a similar facility that has as its primary business the treatment of chronic non-healing wounds; and 2) disclosing, publishing, or disseminating confidential information as defined in the PAAs, to include causing the employees of OVGH to disclose, publish or disseminate the same confidential information.

## II.     Jurisdiction and Applicable State Law

This court is vested with diversity jurisdiction pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the object of the litigation is valued at greater than

---

[2]  The defendants initially included physicians Peter Dickinson ("Dickinson"), Gene Battistella ("Battistella"), and Michael Notte ("Notte").  On July 15, 2010, a stipulation of dismissal with respect to Dickinson was filed with prejudice. (ECF No. 36.)  On May 25, 2010, the court was advised there would be a consensual solution filed with respect to Battistella and Notte.  (See Hr'g Tr. 3, May 24, 2010 (ECF No. 64)).

$75,000.  The parties agree that Pennsylvania law applies.

### III.    Procedural Posture

On March 12, 2010, WCCS filed a complaint alleging breaches of contract against OVGH and the defendant physicians.  (ECF No. 1.)  On the same day, WCCS filed the Motion. On May 24, 2010, the court held a status conference and ordered that fact discovery concerning the matters raised in the Motion be completed by July 23, 2010, and set dates for submitting prehearing statements.

On June 30, 2010, the parties filed a joint motion for a protective order governing confidentiality of documents and information (ECF No. 28), and an amendment thereto on July 1, 2010 (ECF No. 29), which the court granted on July 2, 2010.  (ECF No. 30.)  From June 29, 2010 through July 27, 2010, WCCS took the depositions of Catalane, Georgevich, Kosanovich, Naseer, Scanlan, Sharma, Willis, Thomas Clayton ("Clayton") (WCCS's  general counsel and chief executive officer ("CEO")), Sharon Kogel-Squeri ("Kogel-Squeri") (OVGH's vice president of corporate diagnostics and physician integration), and  William Provenzano ("Provenzo") (OVGH's former president, CEO, and corporate designee witness).

On August 3 and 4, 2010, the court held an evidentiary hearing during which exhibits were admitted into evidence and the testimony of several witnesses was presented.  (See Exhibit and Witness List, Aug. 3-4, 2010; ECF. Nos. 60-61.)  The following witnesses testified at the hearing: 1) Robert Warriner, M.D. ("Warriner") (WCCS's chief medical officer); 2) Clayton; 3) Provenzano; 4) Sherry Chappell ("Chappell") (WCCS's program director at OVGH from 1997 through April 19, 2010); 5) Kosanovich; and 6) Naseer.  At the end of the hearing, the court

ordered the parties to submit proposed findings of fact and conclusions of law.  Each party did

so.  (ECF Nos. 62, 63.)  The matter is ripe for the court to make the following findings of fact

and conclusions of law. [3]


IV.     **Findings of Fact**

      A.     <u>The Parties</u>

1.      WCCI is a Minnesota corporation with its principal place of business in Jacksonville,

Florida.  (Compl. ¶ 1.)  Diversified is a Delaware corporation with its principal place of business

in Jacksonville, Florida.  (Compl. ¶ 2.)  Diversified is a wound care management company that

partners with hospitals to open and manage wound care centers.  (Pls.' Ex. 7.)

2.      OVHG is a nonprofit Pennsylvania corporation that operates an acute care hospital on

Heckel Road, McKees Rocks, Pennsylvania.  (Ex. 7; Hr'g Tr. 194, Aug. 4, 2010 (ECF No. 58)).

3.      On December 1, 1991, OVGH entered into a contractual agreement (the "1991

Agreement") with WCCS whereby OVGH retained WCCS to develop and manage a hospital-

based, multi-disciplinary program for the diagnosis and treatment of patients suffering from non-

healing wounds.

4.      Under the 1991 Agreement, OVGH in 1992 opened The Wound Care Center (the

"Center") to provide treatment to patients that suffer from chronic, non-healing wounds.  (Hr'g

Tr. 195, Aug. 4, 2010; Pls.' Ex. 7.)  OVGH had a contractual relationship with WCCS to manage

the operations of the Center from 1992 through April 19, 2010.  (Pls.' Exs. 7-8.)

---

[3] The Findings of Fact and Conclusions of Law are each set forth in sequentially numbered paragraphs.  For ease of
reference, headings in outline format  - excluding numbers - are also utilized.

5.      Catalane is a licensed physician in Pennsylvania who practiced at the Center from 1992 through April 19, 2010. (Catalane Dep. Tr. 14, July 1, 2010; Defs.' Ex. A.)  He served as the medical director of the Center from July 1, 2007 through April 19, 2010.  (See Catalane PAA, dated July 1, 2007; Pls.' Ex. 10.)  Catalane obtained wound care training at a dedicated offsite training center operated by WCCS.  (Hr'g Tr. 116, Aug. 4, 2010.)

6.      Kosanovich is a licensed physician in Pennsylvania who practiced at the Center from approximately 1994 through April 19, 2010.  (Hr'g Tr. 29, Aug. 4, 2010.)  Kosanovich obtained wound care training at a dedicated offsite training center operated by WCCS.  (Hr'g Tr. 35-37, Aug. 4, 2010)

7.      Georgevich is a licensed physician in Pennsylvania who practiced at the Center from 1992 through late April 2010.  (Georgevich Dep. Tr. 8, July 23, 2010; Defs.' Ex. C.)  He served as the medical director of Center from 1992 through 2004.  (Id.)  Georgevich obtained wound care training at a dedicated offsite training center operated by WCCS.  (Hr'g Tr. 116, Aug. 4, 2010.)

8.       Willis is licensed physician in Pennsylvania who practiced at the Center from July 2000 through April 19, 2010.  (Willis Dep. Tr. 10, July 12, 2010; Defs.' Ex. D.)

9.       Scanlan is a licensed physician in Pennsylvania who practiced at the Center from March 2006 through April 19, 2010.  (Scanlan Dep. Tr. 36, July 21, 2010; Defs.' Ex. E.)

10.     Yellenik is a licensed physician in Pennsylvania who practiced at the Center from June 2008 through October 2008.  (Yellenik Dep. Tr. 11, 39, July 13, 2010; Defs.' Ex. F.)

11.     Naseer is a licensed physician in Pennsylvania who practiced at the Center from August 2008 through April 19, 2010.  (Naseer Dep. Tr. 178-79, July 2, 2010; Defs.' Ex. G.)

12.     Sharma is a licensed physician in Pennsylvania who practiced at the Center from
November 2009 through April 19, 2010.  (Sharma Dep.Tr. 8-10, June 29, 2010; Defs.' Ex.H.)

B.     Relationship Between WCCS and OVGH

13.     Before WCCS and OVGH entered into the 1991 Agreement forming the Center, and
continuing until 1997, there was no facility in the Pittsburgh, Pennsylvania area dedicated
exclusively to the treatment of chronic, non-healing wounds.  (Catalane Dep. Tr. 43.)

14.     OVGH's initial interest in entering into an agreement with WCCS was based upon
WCCS's ownership of Procuren, a proprietary wound-healing gel.  (Hr'g Tr. 195, Aug. 4, 2010.)
The 1991 Agreement entered into between OVGH and WCCS contained the following whereas
clause:

> WHEREAS, [WCCS] has developed a unique hospital based,
> comprehensive and multi-disciplinary program for the diagnosis
> and treatment of such non-healing wounds (the "Program")
> utilizing a patent-pending Platelet Derived Wound Healing
> Formula; (Procuren® Solution) . . .

(Pls.' Ex. 7 at 2.)

15.     The government later called into question the effectiveness of Procuren and stopped
providing reimbursements to OVGH for the product.  Thereafter, WCCS discontinued the use of
Procuren at the Center.  (Hr'g Tr. 198-99, Aug. 4, 2010.)

16.      The 1991 Agreement was amended on five occasions.  The fifth amendment was
effective on February 1, 1999.  (Pls.' Ex. 7.)

17.     With respect to the confidential nature of particular information, the parties to the 1991
Agreement contractually acknowledged that the Center was developed at great expense of time,
money and effort and that all "books, manuals, documents, materials, or other business or

technical information in any form whatsoever, which relates to the [Center] and which was distributed or otherwise disclosed to [OVGH] or its designees…shall constitute Confidential Information." (Pls.' Ex. 7 at Article VII.)

18.     The 1991 Agreement contained noncompete provisions between the parties effective from December 1, 1991 to December 1, 2005, which provided:

> 1.  Non-Compete Obligations.  [OVGH] acknowledges that the goods, services and training provided under the [Center], and the techniques and protocols and other Confidential Information relating to the delivery of such goods, services and training are the result of extensive research and development by [WCCS].
>
>    During the term of this Agreement, and for a period of two (2) years following termination hereof, [OVGH] agrees not to create a specialty program dedicated primarily to wound care treatment or to engage in marketing which is intended to create or which in fact creates the appearance that [OVGH] operates an organized dedicated wound care center.  Nothing herein shall prevent [OVGH] from maintaining a wound care treatment capability comparable to that which currently exists at the [OVGH] or from using any technologies, services or products which may become available to [OVGH] at any time.
>
>    [OVGH] further agrees that it shall not employ or contract with former employees or independent contractors of [WCCS] for a period of two (2) years following the termination of this Agreement, for the purpose of providing Procuren® Solution or other goods or services of a like or similar nature to the goods and services provided under this Agreement.. . .

(Pls.' Ex. 7 at Article VIII ¶ 1.)

19.     The enforceability provision of the 1991 Agreement, between OVGH and WCCS provided:

> 11.  Enforceability.  It is the explicit intent of the parties hereto that no person or entity other than the parties hereto is or shall be entitled to bring any action to enforce any provision of this Agreement against either of the parties hereto.

(Pls.' Ex. 7 at Article IX ¶ 11.)

20.    OVGH agreed to require all personnel providing services through the Center or having

access to confidential information to agree in writing to abide by the confidentiality and

exclusivity requirements of the 1991 Agreement.  (Pls.' Ex. 7.)

21.    On December 1, 2005, the 1991 Agreement, as amended, was replaced with a

management services agreement ("MSA") entered into between OVGH and WCCS.  (Pls.' Ex.

8.)  Pursuant to the MSA, WCCS was contractually obligated to manage the Center's operation

and OVGH paid fees to WCCS.  (Id.)

22.    The MSA contained covenant not to compete and confidentiality provisions.

    a.    The covenant not to compete provisions were limited to the term of the MSA and

provided:

> **7.    COVENANT NOT TO COMPETE.**
>
> 7.1    [OVGH] acknowledges that during the term of this
> Agreement, [WCCS] will make available to [OVGH] various
> equipment, courseware, training, professional knowledge and other
> similar resources, all of which [OVGH] acknowledges is
> proprietary to [WCCS].  In recognition and in consideration of the
> foregoing and the promises made by [WCCS] hereunder, during
> the term of this Agreement, [OVGH] shall not, within a five (5)
> mile radius of the Center (the "Restrictive Area"), without the prior
> written consent of [WCCS], (i) establish, operate or hold itself out
> as operating, either on its own or in collaboration with another
> person or entity, any program, department, line of business, or
> service that has a dedicated purpose or function the treatment of
> chronic, non-healing wounds or (ii) engage or contract with any
> person or entity to provide [OVGH], or any entities owned or
> operated by [OVGH], with comprehensive wound care
> management services of the kind contemplated by this Agreement.
> These restrictions are not intended to prevent [OVGH] or any
> [OVGH] physicians from operating a medical practice or providing
> medical services, including the level and scope of wound healing
> services provided by [OVGH] or [OVGH] physicians in the course

of their normal practice, as long as such services are not provided as part of or in connection with the establishment or operation by [OVGH] of, either on its own or in collaboration with another person or entity, any program, department, line of business, or services that has as a dedicated purpose or function the treatment of chronic, non-healing wounds.

7.2    [OVGH] agrees that during the term of this Agreement and for a period of six (6) months thereafter, [OVGH] shall not directly or indirectly employ, hire, or contract for services with any employees or former employees of [WCCS].

7.3    The parties have agreed that the restrictions in this Section 7 are reasonable in both scope and duration and that [WCCS] is entitled to seek injunction relief to enforce them.  The terms of this Section 7 shall survive the termination of this Agreement

(Pls.' Ex. 8 ¶ 7.)

b.    The confidentiality provision of the MSA survived the termination of the MSA

and provided:

12.  **CONFIDENTIAL INFORMATION.**  In performing their respective obligations hereunder, [OVGH] and [WCCS] will provide each other with proprietary information about inventions; research and development (including, in [WCCS's] case, wound care management protocols); clinical pathways; systems; technological improvements; trade secrets; financial information; and business strategy or policies ("Confidential Information"). Confidential Information shall not include public information or information legally and properly obtained from other sources without breach of any agreement with [OVGH] or [WCCS]. Neither party, nor its employees, will use the other party's Confidential Information for any purpose other than operation of the [Center], and provision of services thereunder, and will not disclose, publish, or disseminate any Confidential Information of the other party to any third party without the express prior written consent of the other party, except as may be required by state or federal law.  Should applicable law require a party to disclose the other party's Confidential Information, the disclosing party will notify the other party of the request for disclosure within at least fifteen (15) days prior to the deadline for disclosure.  The parties agree and acknowledge that each party owns such Confidential

Information, and agree that such information shall remain the exclusive property of such party. This Agreement does not convey any ownership or other interests in Confidential Information. The terms of this Section shall survive the termination of this Agreement.

(Pls.' Ex. 8 ¶ 12.)

      c.     The enforceability provision of the MSA provided:

     21.4  **Severability.** If any provision of this Agreement is, under applicable law, deemed invalid or unenforceable, such provision shall, to the extent permitted under applicable law, be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent possible under applicable law.

(Pls.' Ex. 8 ¶ 21.4.)

23.     In September 2008, OVGH notified WCCS that it intended to terminate the MSA effective December 2008. (Hr'g Tr. 226, Aug. 4, 2010.) WCCS objected to the date of the termination of the MSA based upon its interpretation of the termination provision set forth in the MSA. On December 15, 2009, this court determined that the effective termination date of the MSA was April 19, 2010. (See generally, Civ. A. No. 09-874, (W.D. Pa. 2009) (related to OVGH's motion for declaratory judgment; ECF No. 23).

24.     OVGH terminated the MSA with WCCS on April 19, 2010, the termination date. (Hr'g Tr. 120, Aug. 3, 2010.)

25.     During the period of time WCCS and OVGH were disputing the effective date of termination of the MSA, OVGH commenced negotiations with a competitor of WCCS to manage the wound care center at OVGH. (Hr'g Tr. 172, Aug. 3, 2010.) Minutes of OVGH's board of directors dated April 28, 2009, reflect that OVHG's had identified WCCS's replacement. (Pls.' Ex. 20.)

C.    Relationship Between WCCS and Physician Defendants

26.    In 1992, Georgevich and Catalane staffed the Center initially, and each agreed to maintain the confidentiality of WCCS's information.  (Pls.' Ex. 10.)  In 1994, Kosanovich began to practice at the Center.   (Id.)

27.    In 1997, WCCS implemented three-party PAAs.  The parties to the PAAs were WCCS, OVGH and an individual physician providing services at the Center.  (Pls.' Ex. 10.)  WCCS and OVGH are parties to a PAA with each physician defendant.  (Pls.' Ex. 10; Catalane Dep. Tr. 30-31; Georgevich Dep. Tr. 6-8; Kosanovich Dep. Tr. 13, 29; Naseer Dep. Tr. 12, 39-40; Scanlan Dep. Tr. 35-37; Sharma Dep. Tr. 19-22, 40-44; Willis Dep. Tr. 16-18; Yellenick, Dep. Tr. 14-19, 39, 41.)

28.    The individual PAAs were updated and revised at different times, including in August 2008.  (Hr'g Tr. 115-16 Aug. 3, 2010.)  At OVGH's request, each revised PAA included a provision for the physician defendant to notify OVGH of any payor audits related to services performed by the physician defendant at the Center.  (Id.; Pls.' Ex. 10.)  With respect to other provisions relevant to the Motion, the revised PAAs contain provisions providing that physician defendants:

a)   are independent contractors;

(b) intend to be legally bound;

(c) agree to preserve the confidentiality of information; and

(d) agree during the term of the PAA and for one year thereafter within a twenty-mile radius of the Center not – without the prior written consent of WCCS - to:

establish, operate, contract with, or enter into any business relationship with (including the provision of administrative or

clinical services to or for) a facility or company which has its primary business the treatment of chronic non-healing wounds, . . . or . . . engage or contract with any person or entity to provide, or contract with any competitor of WCCS that provides comprehensive wound care management services of the kind provided by WCCS to the Center.

(Pls.' Ex. 10.)

29.     WCCS's request for a preliminary injunction implicates the confidentiality and restrictive

covenant provisions of the PAAs.

      a.     The confidentiality provisions of the revised PAAs applicable to all

physician defendants provide:

> 9.  **Confidential Information.**  WCCS will provide Physician proprietary and confidential information about WCCS inventions, research and development, wound care clinical pathways, systems, improvement, trade secrets, financial information, and business strategy or policies ("Confidential Information").  Confidential Information shall not include public information or information legally and properly obtained from other sources without breach of any agreement with WCCS.  Physician will not use Confidential Information for any purpose other than for providing Services and will not disclose, publish, or disseminate any Confidential Information to any third party without the express prior written consent of WCCS, except as may be required by state or federal law…Upon termination of the [PAA], Physician will return and cease using all [WCCS] Confidential Information in whatever form or format, or at the [WCCS]'s option, destroy the Confidential Information.. . .

(Pls.' Ex 10, PAA dated Aug. 17, 2008 ¶ 9.)

      b.     The restrictive covenants provisions of the revised PAAs applicable to all

physician defendants provide:

> 14.  **Restrictive Covenant Not to Compete.**  During the term of the [PAA] and for a period of one (1) year following the effective date of its termination, Physician shall not within a twenty (20) mile radius of Center, without the prior written consent of WCCS, (1)

establish, operate, contract with, or enter into any business relationship with (including the provision of administrative or clinical services to or for) a facility or company which has its primary business the treatment of chronic non-healing wounds, (2) employ, hire or contract for services with any employee or former employee of WCCS; or (3) exchange or contract with any person or entity to provide, or contract with any competitor of WCCS that provides comprehensive wound care management services of the kind provided by WCCS to the Center. These restrictions are not intended to prevent Physician from otherwise operating a medical practice or provide any special services. The parties have agreed that this restriction is reasonable in both scope and duration and that WCCS is entitled to seek injunctive relief to enforce it.

(Pls.' Ex 10, PAA, dated Aug. 17, 2008 ¶ 14.)

    c.    The termination provisions of the revised PAAs applicable to all physician defendants provide:

    16.    **Termination.**  Any party may terminate this Agreement by providing the other parties ninety (90) days notice of termination. Any party may terminate this Agreement upon thirty (30) days notice should any other party fail to comply with the terms of this Agreement or fail to meet the Qualifications or perform the services set forth in Attachment A and the failure is not corrected in the thirty (30) period to the satisfaction of the party giving notice. Upon termination, Physician will cooperate with WCCS and [OVGH] to assure a smooth transition and return all of WCCS property and Confidential Information. The provisions of paragraphs 8, 9 [confidential information], 10, 11, 12, and 13 shall survive the termination of this agreement.

(Pls.' Ex 10, PAA, dated Aug. 17, 2008 ¶ 16.)

    d.    The enforceability provisions of the revised PAAs applicable to all physician defendants provide in relevant part:

    17.    **General.** . . . Should any part of this Agreement be found by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall not be affected and each term shall be valid and enforced to the fullest extent permitted by law.. . .

(Pls.' Ex 10, PAA, dated Aug. 17, 2008 ¶ 17.)

      D.     OVGH's Agreement with WCCS's Competitor

30.     On June 3, 2009, OVGH entered into a strategic alliance agreement ("SAA") with

National Wound and Hyperbaric Services, Inc. ("National").  (Pls.' Ex. 11(a).)

31.     Under the SAA, OVGH was charged with identifying a panel of physicians from which

National could select a multi-disciplinary team of physicians trained in wound care and, where

applicable, hyperbaric oxygen therapy ("HBO"), and who have hospital medical staff

membership and clinical privileges at OVGH.  (Pls.' Ex. 11 at OVGH 08 3202.)  Kogel-Squeri

testified that it was assumed that all the current OVGH panel physicians would continue

practicing with the new wound care center, because no reason was given to the contrary.  (Kogel-

Squeri Dep. Tr. 46, July 23, 2010.)

32.     Under the terms of the SAA, National was to provide:

> An initial education seminar for Panel Physicians and Center
> Personnel (the "National Healing Institute") and ongoing training
> and specialty wound care, HBO therapy, if applicable, and other
> agreed upon methodologies for healing wounds.  National shall, on
> an annual basis, pay for such training.  National shall pay for travel
> accommodations for National Personnel to attend such training . . .

(Pls.' Ex. 11A at OVGH 08-3204.)  National provided training to only one physician selected for

its panel that had not previously provided wound care services at the Center.  (Hr'g Tr. 97-98,

Aug. 4, 2010;  Catalane Dep. Tr. 51, 62; Kosanovich Dep. Tr. 74; Naseer Dep. Tr. 14, 21;

Sharma Dep. Tr. 27; Willis Dep. Tr. 38-39; Yellenik Dep. Tr. 19.)  No physician defendant

currently working at the OVGH-National Healing Institute was trained in HBO medicine by

National.

33.     In the SAA, OVGH and National agreed:

> From and after the execution date and for a period of one (1) year
> following the termination of the [SAA], the parties agree that
> neither of them shall, without the express written consent of the
> other Party, directly or indirectly, employ, contract with, or solicit
> to employ or contract with any individual who is then or who was
> within one (1) year prior thereto and [sic] "employee or
> independent contractor of the other Party"

(Pls.' Ex. 11 08 -3208, § 5.1(a).)  OVGH and National recognized that each has a legitimate

business interest justifying the restrictions contained in the covenant against hiring and

solicitation.  (Id. § 5.1(c).)  OVGH agreed to keep confidential National's information.  (Id. at

OVGH 08 3209, § 6.1.)

34.     In November 2009, Sharma, the newest OVGH physician assigned to the Center, was

asked to sign a PAA identical to all other physicians, which he did on December 4, 2009.

(Sharma Dep. Tr. 40, 46.)   On January 7, 2010, Kogel-Squeri, an OVGH vice president,

modified sections 14 and 15 of that PAA, striking the covenant not to compete.  Provenzano,

OVGH's CEO, initialed the changes and forwarded that PAA to WCCS.  (Kogel-Squeri Dep. Tr.

17-19.)

35.     Before Provenzano changed Sharma's PAA, Chappell, the Center's program director, did

not advise anyone at OVGH that WCCS intended to enforce its covenants not to compete.  (Hr'g

Tr. 125, Aug. 4, 2010.)  Upon receipt of Sharma's modified PAA, Clayton, WCCS's general

counsel and CEO, notified Provenzano by letter dated January 21, 2010, objecting to the proposed

changes with respect to the covenant not to compete.  (Pls.' Ex. 16.)  Provenzano made the

changes to Sharma's PAA because WCCS raised issues with respect to enforcement of the post-

termination covenants not to compete.  (Hr'g Tr. 89-91, Aug. 4, 2010.)

36.     By letter dated, January 28, 2010, OVGH advised WCCS that OVGH: 1) disagreed with

WCCS's "position that physicians who currently practice at the center will violate the terms of

the PAA if they practice medicine in the area after the April 19, 2010 termination of the wound

care management agreement"; 2) intended to have Sharma continue to provide services at the

Center; and 3) requested that WCCS withdraw its request, pursuant to the letter dated January 21,

2010 that Sharma not provide medical services. (Pls.' Ex. 17.)

37.     By another letter dated January 21, 2010, WCCS notified the physician defendants that the

MSA would terminate in ninety days and that, pursuant to the terms of the PAAs, the relationship

between WCCS and physician defendants would end on April 19, 2010. WCCS advised each

physician defendant that the covenant not to compete remained in force. (Pls.' Ex. 14.)

38.     By letter dated, January 26, 2010, OVGH demanded:

> Diversified immediately notify all recipients of the [January 21, 2010]
> letter that it is withdrawn with regard to the non-competition provision. If
> no such retraction occurs, [OVGH] will consider itself free to pursue any
> and all legal remedies occasioned by the letter, including claims for
> attorneys' fees.

(Pls. Ex. 15.)

39.     On March 12, 2010, OVGH and National entered into an amendment to the SAA,

agreeing that OVGH – rather than National, as originally agreed – would engage a medical

director and assistant medical director, as circumstances required, for a period of one year

beginning on April 20, 2010 through April 19, 2011 (the "Interim Period"). (Pls.' Ex. 12.) The

amendment to the SAA identifies Catalane as medical director and Kosanovich as assistant

medical director. The amendment to the SAA provides that OVGH, not National, shall

compensate each medical director during the Interim Period, and National shall compensate each

medical director after the Interim Period.  (Id.)  In addition, the amendment to the SAA includes

a form of a medical director agreement ("MDA") containing the same payment provisions set

forth between OVGH and National.  (Id.)   The MDA provides that the medical director agrees to

keep confidential certain National information, and agrees to a one-year covenant not to compete.

(Id. )  Upon expiration of the Interim Period, the obligations of the medical director pursuant to

the MDA "shift and become obligations of physician owing to National."  (Pls.' Ex. 12 ¶ 8.)

40.     Provenzano testified that Kogel-Squeri was the person with the most details concerning

that National contract, and that he did not recall discussing the PAAs with Kogel-Squieri while

she was involved in negotiating the contract with National.  (Id. at 19.)

41.     Kogel-Squeri testified that she was without knowledge of any PAA until Sharma's

situation, and that the changes to the SAA were made at the suggestion of National's legal

counsel, in an effort to avoid issues arising from WCCS's action against OVGH.  (Hr'g Tr. 19,

60, Aug. 4, 2010.)[4]

42.     OVGH executed an indemnity agreement with all physician defendants under which

OVGH agreed to hold harmless the physician defendants for all claims in the instant action and

to pay the attorneys' fees for the physician defendants.  (Pls.' Ex. 13.)

---

[4] The court does not credit Provenzano's testimony that OVGH amended its agreement with National to ensure that
an assistant medical director would report to a medical director, and that none of the reasons for the amendment to
the SAA were due to claims made with respect to OVGH or the defendant physicians' alleged violations of the terms
of the PAAs with WCCS.  (Hr's Tr. 24-25, Aug. 24, 2010.)  Provenzano did not recall why OVGH and National
amended the SAA to provide for OVGH to pay the medical directors and for National to reimburse OVGH, rather
than for National to pay directly the medical directors.  (Hr'g Tr. 70, Aug. 4, 2010.)

E.    Consideration

43.    WCCS prepared the revised PAAs executed by all physician defendants after August 17,

2008, which expressly disclaim any compensation in return for physician defendants' fulfillment

of their contractual obligations.  The relevant language provides:

> 3.    **Compensation.**  Physician shall be compensated, solely through
> his/her billing for, and collection of, fees for services rendered by
> Physician in furtherance of the Program.  Physician will not receive
> any compensation from [OVGH] or WCCS for services provided
> at the Center pursuant to this Agreement.

(Pls.' Ex. 10, PAAs dated Aug. 17, 2008 ¶ 3.)

44.    Each PAA executed after August 17, 2008, contains a provision placing responsibility

upon the physician defendant related to audits which provides:

> 2.    **Audits.**  Physician shall inform [OVGH] of any and all audits from
> Medicare, Highmark, or any other payors that relate to services that
> the Physician performed at the Wound Care Center, and Physician
> shall share those audit results with the [OVGH].

(Pls.' Ex. 10, PAAs dated Aug. 17, 2008 ¶ 2.)  No physician defendant received any additional

compensation for this obligation which was inserted into each PAA after August 17, 2008.  (Hr'g

Tr. 44-45, Aug. 4, 2010.)

45.    Catalane did not receive any compensation from WCCS as consideration for executing

the five PAAs he entered into with OVGH and WCCS during his eighteen-year tenure at the

Center.  (Catalane Dep. Tr. 29.)  Catalane's PAA dated June 19, 1997, reflects his receipt of the

title of "Medical Director".  He received training related to this position from WCCS.  (Hr'g Tr.

113-14, Aug. 3, 2010.)  OVGH compensated Catalane for his duties as the medical director of

the Center.  (Id. at 113.)

46.      Kosanovich did not receive any compensation from WCCS.  (Hr'g Tr. 45, Aug. 4, 2010.)

When questioned with respect to any additional consideration that was provided to Kosanovich

under his 2008 PAA, Clayton testified that WCCS relied upon the "intending to be legally

bound" language in the PAAs as sufficient legal consideration.  (Hr'g Tr. 115, Aug. 3, 2010.)

WCCS takes this same position with respect to each physician defendant.  (Id.)

        F.      Confidential Information Provided to Physician Defendants

47.      WCCS alleges that each physician defendant was provided with confidential information

consisting of: a) Clinical Practice Guidelines ("CPGs"); b) policy and procedure manuals; and 3)

forms and documentation instructions.  (Hr'g Tr. 66, Aug. 3, 2010.)  Warriner, WCCS's chief

medical officer, testified that the structure and organization related to the knowledge base of the

information contained in the CPGs is unique to WCCS, but that the knowledge base of the CPGs

consists of public information.  (Id.)

48.      Catalane denied a) receiving any information from WCCS that would be considered

confidential; b) possessing any documentation from the Center as of July 1, 2010; and c)  using

the CPGs made available at the Center.  (Catalane Dep. Tr. 19-20.)  He testified that he did not

know any physician who worked at the Center that "went to a binder and said, what am I going to

do with a wound, let me look at this."   (Id. at 68.)

49.      Kosanovich testified that during the treatment of patients he did not utilize the CPGs

provided by WCCS and maintained at the Center.  (Hr'g Tr. 46, Aug.4, 2010.)  Scanlon, Willis,

Yellenik, Naseer, and Sharma testified that they did not recall utilizing the CPGs or any other

literature or reference material provided by WCCS while WCCS managed the Center.  (Hr'g Tr.

180, Aug. 4, 2010; Scanlon Dep. Tr. 38-39; Willis Dep. Tr. 43; Yellenik Dep. Tr. 18; Sharma

Dep. Tr. 70-71.)

50.     In March 2010, each physician defendant executed an acknowledgement expressly

agreeing not to use or disclose any of WCCS's confidential information following the

termination of the MSA on April 19, 2010.  (See Pls.' Exs. i – p.)

51.     On April 19, 2010, Chappel, WCCS's program director at the Center, removed from the

Center the CPGs and other WCCS materials, including marketing materials, forms, brochures

and other reference materials.  (Hr'g Tr. 145-47, Aug. 4, 2010.)

52.     Clayton, WCCS's CEO, had no reason to believe that any physician defendant did not

return all WCCS's property  (Hr'g Tr. 156, Aug. 3, 2010); and had no knowledge or evidence

that any physician defendant used any of WCCS's CPGs, policy or procedure manuals, forms and

documentation instructions after April 19, 2010.  (Id. at 72-73.)

>    G.     WCCS's Business Interests and Efforts to Protect Confidential Information

53.     WCCS claims to have legitimate business interests in the confidential and alleged

trade secret information in the form of: a) training provided to the physician defendants; b) good

will; and c) its patient referral base.  (Hr'g Tr. 26-36, Aug. 3, 2010; Hr'g Tr. 111-118, Aug. 4,

2010.)

54.     Warriner testified that the Center:

        a) is an organized environment that combines operational, procedural, and technical

resources, including physicians specifically trained in the medical and surgical care of patients

with chronic wound diagnosis; and

b) centers on CPGs, which a physician, who may have limited or no experience in certain wound types, can utilize to provide care by following the wound care algorithms to develop specific care plans for those wound types.

55.    Warriner testified that the CPGs are revised using an extensive database of patient-healing data, and it is impossible to practice using WCCS's integrated care delivery model without being influenced by the CPGs.  (Hr'g Tr. 20, 26, 28-30, 46, 75, Aug. 3, 2010.)

56.    A copy of the CPGs was maintained by the program director at the Center.  Physicians had access to the CPGs, but could not copy or remove them from the Center.  (Hr'g Tr. 32, Aug. 3, 2010.)

57.    Chappell testified that:

a) Catalane, while serving as medical director of the Center, requested a copy of the CPGs for each physician and the request was denied; and

b) she observed Catalane, Naseer, and Sharma consult the CPGs.  (Hr'g Tr. 111, 118, Aug. 4, 2011.)

H.    Specialized Training

58.    Warriner testified that:

a) before the advent of the CPGs, all doctors were trained in WCCS's proprietary algorithm for wound healing;

b) by the late 1990s, WCCS trained physicians to practice at the Center using an online training facility called "Courseware";

c) after Warriner became the medical director of WCCS, physicians obtained training through a weeklong, in-person training session at a facility in Woodlands, Texas, which involved

an introduction to WCCS's wound care approach by outlining broad concepts, and included a private session for medical directors; and

d) WCCS makes available webcasts of training sessions for further instruction on WCCS's approach to wound care to any physician practicing at a wound care center operated by WCCS or its affiliates. (Hr'g Tr. 23, 32, 35-36, 65, Aug. 3, 2010; Pls.' Exs. 29, 32.)

I.      Goodwill and Patient Referral Base

59.    "Wound Care Center" is a registered trademark of WCCS. (Hr'g Tr. 135, Aug. 3, 2010.)

60.    WCCS spent approximately $300,000 per year on developing community education programs for program directors, and more than $75,000 per year for a podiatrist education program. (Hr'g Tr. 75, 167-68, Aug. 3, 2010.)

61.    Chappell visited the offices of referring physicians to educate them about the Center and maintained contact to advise them about the progress of their patients. (Hr'g Tr. 106, 180, Aug. 4, 2010.) These efforts contributed to the development of a large patient referral base. (Id. at 113-14.)

62.    Chappell testified that referring physicians often referred patients to the Center as an entity, as opposed to a specific doctor at the Center. As a result, Sharma and Naseer, as OVGH employees, worked at the Center when they had time, until their practices became busy enough that they no longer needed to remain as employees of OVGH. (Hr'g Tr. 124, Aug. 4, 2010.)

63.    Kosanovich testified that the services for which he billed were increased because of his affiliation with the Center. (Hr'g Tr. 55, Aug. 4, 2010.)

64.    A poster advertising the Center was displayed at OVGH until August 2010 in a glassed-in area near the cafeteria. The poster noted different specialties offered by OVGH. (Hr'g Tr. 84-86,

Aug. 4, 2010.)  Provenzano did not know why the poster remained in that spot, as "[p]eople were instructed to take everything down and we actually hired a marketing company to change the name and to move it . . .."  (Id. at 85.)

        J.        <u>WCCS's Efforts to Protect Its Business Interests</u>

65.      Since 1997, WCCS drafted and entered into an individual PAA with each physician defendant.  WCCS maintained a consistent twenty-mile geographic scope and one-year temporal scope in the noncompete provisions of the PAAs.  (Hr'g Tr. 100, Aug. 3, 2010.)

66.      WCCS required all physicians and nurse practitioners providing services at the Center to agree to a covenant not to compete with identical geographic and temporal restrictions.  (Pls.' Ex. 42.)

67.      Within a fifty-mile radius of OVGH, WCCS manages, among others, wound care centers at Jefferson Health Services ("Jefferson"), East Liverpool City Hospital ("East Liverpool"), and St. Elizabeth Boardman Health Center ("St. Elizabeth").  (Pls.' Exs. 42-44.)  WCCS's contracts with Jefferson, East Liverpool and St. Elizabeth contain confidentiality provisions.  (Pls.' Ex. 44.)  With respect to a covenant not to compete provision, the Jefferson contract restricts competition post termination for one year; the St. Elizabeth contract restricts competition during the term of the contract.  No physician at East Liverpool had signed a PAA by August 18, 2010, because the wound care center had not yet opened.  (Hr'g Tr. 126, Aug. 3, 2010; Pls.' Ex. 42.)

68.      Eleven physicians, who entered into PAAs with WCCS, separated from the Center after 1998.  (Defs.' Ex. R, Pls.' Answer to Interrogatory 3.)  When asked what efforts WCCS undertook to protect its alleged confidential information from these eleven physicians, Clayton testified that he did not know whether any of the eleven physicians continued to use WCCS's

confidential information after departing from the Center or breached any terms of their respective PAAs. (Hr'g Tr. 162, Aug. 3, 2010.)

69.     Chappell, WCCS's program director at the Center, was asked if she ever had a conversation with any of the eleven physicians who previously separated from the Center with respect to whether they possessed any information that was developed by WCCS. Chappell responded to that inquiry: "No, I did not. They were free to have that material." (Hr'g Tr. 134-35, Aug. 4, 2010.)

70.     Chappell testified that the Center experienced a substantial decrease in patient volume after the November 2, 2007 separation from the Center of Dr. Adoki ("Adoki"), who had executed a PAA with WCCS which contained a confidentiality provision and a covenant not to compete. (Hr'g Tr. 136, Aug. 4, 2010.) Chappell did not ask Adoki to return any materials belonging to WCCS or investigate his activities. (Hr'g Tr. 138-40, 147, Aug. 4, 2010.)

71.     Chappell was responsible for maintaining the confidential nature of the CPGs within the Center. (Hr'g Tr. 19, Aug. 4, 2010.) Chappell testified that the CPG binders "floated around" the Center between her office, the manager's office, the physicians' offices, the conference table and the HBO room. (Id. at 137-38.)

72.     WCCS did not make any effort to retain any physician defendant as an independent contractor in other programs it operated. (Hr'g Tr. 147.)

       K.     WCCS's Notice to Physician Defendants About Termination of PAAs

73.     After this court determined that the MSA between WCCS and OVGH could terminate on April 19, 2010, WCCS sent letters to all physician defendants indicating that the PAAs would terminate on that date, but the confidentiality and restrictive covenant provisions contained in the

PAAs would survive. Defendants aver that all physician defendants and OVGH notified WCCS that they do not intend to comply with any post-termination requirements. Id. ¶¶ 64-67.

**V**.     **Conclusions of Law**

     A.     Preliminary Injunction Standard of Review - Four Factors

1.     With respect to the appropriate standard of review a district court should undertake in determining whether to grant a preliminary injunction, the Court of Appeals for the Third Circuit recently stated:

> [A] court must consider whether the party seeking the injunction has satisfied four factors: "(1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interests favors such relief." *Miller[v. Mitchell]*, 598 F.3d [139] at 147 (citing *Child Evangelism Fellowship of New Jersey Inc. v. Stafford Twp. Sch. Dist.,* 386 F.3d 514, 524 (3d Cir. 2004)).

Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 109 (3d Cir. 2010).

2.     The moving party need not "prevail on all four factors, only on the overall need for an injunction." Neo Gen Screening, Inc. v. TeleChem In'l, Inc., 69 F. App'x 550, 554 (3d Cir. 2003) (citing Acierno v. New Castle Cnty, 40 F.3d 645, 653 (3d Cir. 1994)) (noting that the burden is on the moving party on the first two issues, but the district court should itself consider the second two). "A sufficiently strong showing on either the likelihood of success or irreparable harm may justify an injunction, though a petitioner's showing on the other factors may be lacking." Id. WCCS claims it meets the preliminary injunction standard with respect to alleged violations of the confidentiality and restrictive covenant provisions of the PAAs. Each claim will be discussed.

B.       First Factor - Likelihood of Success on the Merits

a.       Confidentiality Provisions

WCCS asserts that the confidentiality provisions of the PAAs encompass trade secrets

and other confidential information.  The applicable provision provides:

> 9.   **Confidential Information.**  WCCS will provide Physician
> proprietary and confidential information about WCCS inventions,
> research and development, wound care clinical pathways, systems,
> improvement, trade secrets, financial information, and business
> strategy or policies ("Confidential Information").  Confidential
> Information shall not include public information or information
> legally and properly obtained from other sources without breach of
> any agreement with WCCS.  Physician will not use Confidential
> Information for any purpose other than for providing Services and
> will not disclose, publish, or disseminate any Confidential
> Information to any third party without the express prior written
> consent of WCCS, except as may be required by state or federal
> law…Upon termination of the [PAA], Physician will return and
> cease using all [WCCS] Confidential Information in whatever form
> or format, or at the [WCCS]'s option, destroy the Confidential
> Information.. . .

(Pls.' Ex 10, PAA dated Aug. 17, 2008 ¶ 9.)  The court will first address the asserted trade

secrets and then address the other asserted confidential information.

i.       Trade Secrets

3.       For purposes of a claim of misappropriation of a trade secret, a trade secret is statutorily

defined under Pennsylvania law pursuant to the Pennsylvania Uniform Trade Secrets Act

("PUTSA"), 12 PA. CONS. STAT. §§ 5301 et seq., as:

> Information, including a formula, drawing, pattern, compilation
> including a customer list, program, device, method, technique or
> process that:
>> (1)   Derives independent economic value, actual or
>> potential, from not being generally known to, and not being
>> readily ascertainable by proper means by, other persons who
>> can obtain economic value from its disclosure or use.

          (2)   Is the subject of efforts that are reasonable under the circumstances to maintain it secrecy.

12 Pa. Cons. Stat. § 5302.

4.      "'A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'" Bimbo Bakeries, 613 F.3d at 109 (quoting Rohm and Hass Co. v. Lin, 992 A.2d 132, 143 n.4 (Pa. Super. Ct. 2010)).

5.      In Bimbo Bakeries, the Court of Appeals for the Third Circuit affirmed the issuance of a preliminary injunction prohibiting a company executive from working for a competitor due to concerns that trade secrets would be misappropriated before the district court could resolve the merits of the underlying claim. Bimbo Bakeries, 613 F.3d at 109. The defendant executive had signed an agreement not to use or disclose any of the plaintiff Bimbo's confidential or proprietary information during or after the term of his employment with Bimbo. The agreement did not include a restrictive covenant, concerning where the executive could work after termination of his employment with Bimbo.

      Bimbo produced baked goods under brand names including Thomas' English Muffins and Boboli. The executive was a vice president of operations who was directly in charge of five production facilities, oversaw areas of product quality, costs, labor issues, and new product development. Among other things, he worked closely with strategic planning and had access to a broad range of Bimbo's confidential information, including access to company formulas and production parameters necessary to replicate the "nooks and crannies" texture unique to Thomas' English Muffins.

On October 15, 2009, the executive accepted a position with Hostess, a close competitor of Bimbo, and agreed to commence work in January 2010. The executive did not tell Bimbo about his intention to leave Bimbo until January 4, 2010 when – without disclosing that he was taking a position at Hostess - he reported to Bimbo that his last day would be January 15, 2010. On January 12, 2010, Hostess announced that they were hiring the executive as a vice president of bakery operations. The following day Bimbo demanded that the executive immediately vacate his office. Bimbo hired a computer forensics expert to investigate the executive's use of his computer during December 2009 and January 2010. The investigation revealed that during that time a user, logged on as the executive, accessed a number of confidential documents, including twelve files in the span of thirteen seconds just minutes after the executive informed Bimbo that he was going to work for Hostess. The investigation indicated that the user had similar patterns of access to multiple highly sensitive documents in the preceding weeks, and that a flash drive and two external hard drives had been connected to the computer at one time or another.

Bimbo filed a complaint against the executive and moved for a preliminary injunction. After a hearing, the court determined that Bimbo would likely prevail on the merits of its trade secrets claim and granted the preliminary injunction barring the executive from working for Hostess until the resolution of the underlying complaint. The court ordered the executive to return to Bimbo any proprietary or confidential information and barred the executive from disclosing any of that information to Hostess. The Court of Appeals for the Third Circuit affirmed the district court's grant of the preliminary injunction and held that Bimbo demonstrated a likelihood of the success on its misappropriation of trade secrets claim.

6.      Under Pennsylvania law, a court has discretion to enjoin a defendant from beginning new employment if the facts of the case support a "substantial threat of a trade secret misappropriation" or a "sufficient likelihood" of "defendant [disclosing a trade secret] in the future." Bimbo Bakeries, 619 F.3d at 113, 116 (questioning any interpretation of a "virtually impossible" standard suggested in Victaulic Co. v. Tieman, 499 F.3d 227 (3d Cir. 2007)). If so, "the proper scope of the relief, depends on a highly fact-specific inquiry into the situation in the case the court is considering." Id. at 113.

7.      "'[T]rade secrets need not be technical in nature' to be protected fully by Pennsylvania law." Bimbo Bakeries, 613 F.3d at 112 (quoting Air Prods. & Chems., Inc. v. Johnson, 442 A.2d 1114, 1124 (Pa. Super. Ct. 1982)); Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1228 (Pa. Super. Ct. 1989) (en banc) ("[T]he particular character of the information is not relevant.... [It] may consist of compilations of purely commercial information.") (citing Morgan's Home Equip. Corp. v. Martucci, 136 A.2d 838 (Pa. 1957)).

8.      Pennsylvania courts look to six factors to determine whether information is protected as a trade secret:

> (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others.

Bimbo Bakeries, 613 F.3d at 109 (citing Crum v. Bridgestone/Firestone N. Am. Tire, LLC, 907 A.2d 578, 585 (Pa. Super. Ct. 2006)).

9.     WCCS argues that its treatment methods and techniques, including the CPGs and database of treatment results, constitute trade secrets because the structure and organization of the public information was unique and it employed efforts reasonable under the circumstances to maintain secrecy by restricting access and copying of such information. The evidence adduced with respect to the structure and organization of the public information in the CPGs and WCCS's efforts to maintain its secrecy, however, was not sufficient to support the characterization of the methods and techniques as trade secrets. Several physician defendants testified that the information upon which the CPGs is based is general wound treatment information taught in standard medical school programs. The evidence adduced at the hearing supports a finding the information in the CPGs regarding the treatment of wounds is generally known outside of the Centers operated by WCCS. OVGH's supervisor of the program, Chappell, testified that the information in the CPGS is known by other employees involved in WCCS's business and that other physicians who previously left the Center were not asked to return any training manuals.

10.     The Center was the initial medical center in the Pittsburgh, Pennsylvania area to commit resources to develop the specialized treatment of non-healing wounds. Being the first to enter this field in Pittsburgh does not equate to trade secret status warranting legal protection. WCCS admits that the field of treating non-healing chronic wounds has become very competitive. The value of WCCS's alleged trade secrets to its competitors is diminished because it is reasonable to conclude that the competitors acquired similar information – otherwise they could not effectively compete. The organized method of treating non-healing wounds, including the use of WCCS's CPGs and manuals, in setting up and operating a wound care center, may

distinguish a wound care center from its competitors and it is a close call whether these methods

rise to the level of trade secret status.  The court, however, on the evidence presented cannot

conclude with a high degree of certainty that WCCS will prevail on the merits.  To succeed on

the merits, WCCS would need to present additional evidence showing the distinctions of its

methods.  An expert's opinion may be helpful.

ii.    <u>Other Confidential Information</u>

11.    Protection afforded by a confidentiality agreement does not need to rise to the level of a

trade secret to merit injunctive protection.  <u>Den-Tal-Ez,</u> 566 A.2d at 1224 (noting that certain

information protected by agreement need not necessarily qualify as "trade secret" to merit

protection, and affirming the grant of injunctive relief).

12.    An injunction may properly issue where information subject to a confidentiality

agreement may be used or disclosed in contravention of the agreement.  <u>See</u> <u>PharMethod, Inc. v.</u>

<u>Caserta</u>, 382 F. App'x 214, 219-21 (3d Cir. 2010) (citing <u>Insulation Corp. of Am. v. Brobston</u>,

667 A.2d 729, 735 (Pa. Super. Ct. 1995)); <u>Neo Gen Screening, Inc. v. Telechem Int'l, Inc.,</u> 69 F.

App'x 550, 555 (3d Cir. 2003) (affirming grant of preliminary injunction where confidentiality

agreement governed party's access to and use of a clean room for technology development); <u>see</u>

<u>also</u> <u>Home Line Furniture Indus., Inc. v. Banner Retail Marketing, LLC</u>, 630 F. Supp.2d 527,

543-44 (E.D. Pa. 2009) (granting preliminary injunction where party violated terms of

confidentiality agreement).

13.    WCCS may preclude physician defendants from disclosing confidential information, as

defined in the PAAs.  The critical issue becomes determining what information is properly

characterized as confidential in nature.  WCCS argues it is inevitable that the defendant

31

physicians will utilize and disclose confidential information.  This position is based on two premises: 1) the physician defendants will provide the identical care for National they previously provided at the Center; and 2) National did not provide the physician defendants with any training in the operation and provision of care at a dedicated wound-healing facility.  This argument assumes that the training each physician defendant received from WCCS is of a confidential nature.  The confidentiality provision of the PAAs reflects that "Confidential Information shall not include public information or information legally and properly obtained from other sources without breach of any agreement with [WCCS]."  (Pls.' Ex. 10, PAA dated Aug. 17, 2008 ¶ 9.)  As discussed above, the evidence of record shows that the information in the CPGs is mostly public in nature.  The organization and structure of the information may be proprietary.  WCCS's position that the structure and organization of the information is unique, however, is weakened by the testimony of all physician defendants to the contrary, which the court finds partially credible.  It is impossible to discern from the record what information is in fact confidential.  It is clear that wound treatment in general is not confidential.  The court is not able to identify with specificity what information in the CPGs a physician defendant should be precluded from disclosing.  The court finds that the likelihood of success on the confidentiality issue has not been shown at this stage.

14.     The record before this court does not support a concern for the potential misappropriation by defendants of WCCS's confidential or trade secret information similar to the concerns before the court in Bimbo Bakeries.  There was no showing that the physician defendants were privy to WCCS's strategic planning or National's strategic planning.  WCCS did not adduce sufficient evidence for this court to determine the existence of a substantial threat that the physician

defendants would misappropriate confidential information. No physician defendant retained a copy of the CPGs and the physician defendants signed an acknowledgment expressly agreeing not to use or disclose any of WCCS's confidential information after April, 19, 2010. Under these circumstances, WCCS – at the preliminary injunction stage - did not show a likelihood of success on the merits of the underlying breach of contract claim related to disclosure of confidential information.

    b.  <u>Restrictive Covenants</u>

     i.  <u>General Framework</u>

15.  "In Pennsylvania, restrictive covenants are enforceable if they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent." <u>Hess v. Gebhard & Co. Inc.</u>, 808 A.2d 912, 917 (Pa. 2002) (citing <u>Sidco Paper Co. v. Aaron</u>, 351 A.2d 250 (pa. 1976); <u>Morgan's Home Equip. Corp. v. Martucci</u>, 136 A.2d 838 (1957)). "'Our law permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer.'" <u>Id.</u> (quoting <u>Sidco Paper</u>, 351 A.2d at 254).

16.  "Post-employment restrictive covenants . . . are subject to a more stringent test of reasonableness than covenants ancillary to the sale of a business." <u>Missett v. Hub Int'l Pa., LLC</u>, 6 A.3d 530, 538 (Pa. Super. Ct. 2010) (citing <u>Brobston</u>, 667 A.2d at 733)). Pennsylvania courts are reluctant "to enforce any contracts in restraint of free trade, particularly where they restrain an individual from earning a living at his trade." <u>Id.</u> A "determination of whether a post-employment restrictive covenant is reasonable, and . . . enforceable, is a factual one [requiring

consideration of all] relevant facts and circumstances." Id. (citing Brobston, 667 A.2d at 733-34).

17.     In analyzing the enforcement of restrictive covenants in the context of an employment contract, the Court of Appeals for the Third Circuit recently noted:

> [P]ost-employment restrictive covenants are enforceable if: (1) they are incident to an employment relationship between the parties; (2) the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and (3) the restrictions imposed are reasonably limited in duration and geographic extent.

PharMethod, 382 F. App'x at 219 (citing Sidco Paper, 351 A.2d at 252; see Volunteer Fireman's Ins. Servs., Inc v. CIGNA Prop. & Cas. Ins. Agency, 693 A.2d 1330, 1337 (Pa. Super. Ct. 1997) (enforcing noncompete agreement between agent distributor and insurer underwriter where agent distributor developed national marketing and distribution systems for distinct program of coverages for niche insurance market).

## ii.     Consideration

18.     Generally, under Pennsylvania law a covenant not to compete executed after an employment relationship has begun requires additional consideration to support the covenant. Latuszewski v. Valic Fin. Advisors, Inc., Civ. A. No. 03-0540, 2007 WL 4462739, at *10 (W.D. Pa. Dec. 19, 2007) (citing Kistler, Inc. v O'Brien, 347 A.2d 311, 316 (Pa. 1975); Maint. Specialties, Inc. v. Gottus, 314 A.2d 279 (Pa. 1974)).

19.     WCCS maintains that the terms of the covenants not to compete provide adequate consideration, i.e., in exchange for the ability to practice at the Center, including the training plaintiffs provided, and access to WCCS's proprietary wound treatment methods, the physician

defendants agreed not to compete against WCCS within twenty miles of the Center for a period

of one year.  In addition, WCCS contends that each PAA is supported by adequate consideration

because the PAA contains the phrase "intending to be legally bound".   (Hr'g Tr. 115, Aug. 3.

2010.)  WCCS relies upon Pennsylvania's Uniform Written Obligations Act ("PUWOA"), 33

PA. CONS. STAT. § 6.

20.     The PUWOA provides that an agreement cannot fail for lack of consideration if the

writing contains a statement that the signer intends to be legally bound.  33 PA. CONS. STAT. § 6;

Latuszewski, 2007 WL 4462739, at **10-11 (finding under the PUWOA that the statement of

intent to be legally bound acts as a valid substitute for consideration to support a noncompete

agreement in the context of employment; and noting that no appellate court in Pennsylvania has

ever ruled that the PUWOA does not apply to employment noncompete contractual provisions).

The PUWOA is applicable to the PAAs and this court finds that each PAA is supported by

consideration.

### iii.     Incident to an Employment Contract

21.     Under Pennsylvania law, covenants not to compete may be enforced if ancillary to

an independent contractor agreement.  See Quaker City Engine Rebuilders, Inc., v. Toscano, 535

A.2d 1083, 1086 (Pa. Super. Ct. 1987) (finding enforceable covenant not to compete in

independent contractor agreement, but remanding for consideration of proper geographic scope

of restriction); see also Jackson & Coker Locum Tenens, Inc. v. Slawek, No. 93-6459, 1994 WL

164103, at *2 (E.D. Pa. May 3, 1994) (finding that covenant not to compete contained in

independent contractor agreement whereby physician agreed to be placed in locum tenens

positions by company was "sufficiently related to employment to support a restrictive covenant").

22.     "[S]ome Pennsylvania courts have shown a reluctance to enforce restrictive covenants against an employee who leaves employment involuntarily." PharMethod, F. App'x at 221 (citing Brobston, 667 A.2d at 735).  The court of appeals in PharMethod noted:

> In *Brobston,* the court explained that once the employer has terminated an employee, the employer's "need to protect itself from the former employee is diminished by the fact that the employee's worth to the corporation is presumably insignificant. Under such circumstances, [the court] conclude[d] that it is unreasonable as a matter of law to permit the employer to retain unfettered control over that which it has effectively discarded as worthless to its legitimate business interests." [Insulation Corp. of Am. v. Brobston], 667 A.2d at 735.

PharMethod, F. App'x at 221.  Here, WCCS terminated the physician defendants' PPAs.  Under Brobston, this fact could tip the balance of the equities in the physician defendants' favor.  The balance of equities in the physician defendants' favor, however, is mitigated by OGVH – a party to the PAAs – terminating the relationship between OGVH and WCCS and OVGH identifying certain physician defendants to be chosen by National, a competitor of WCCS.

                    iv.     Legitimate Business Interest

23.     "A restrictive covenant is reasonably necessary for the protection of the employer when it is narrowly tailored to protect an employer's *legitimate* interests.  Interests that a covenant may legitimately protect include trade secrets, confidential information, good will, and unique or extraordinary skills." Id. at 220 (quoting Victaulic Co., 499 F.3d at 235).

24.     Legitimate business interests protected by law in Pennsylvania include "trade secrets or confidential information, unique or extraordinary skills, customer good will, and investments in an employee specialized training program." Wellspan Health v. Bayliss, 869 A.2d 990, 995 (Pa. Super. Ct. 2005) (quotation omitted) (affirming a permanent injunction against a health system's former physician-employee). Goodwill can be protected even if it has been acquired through the efforts of an employee. Id.

25.     Although enforceable upon satisfaction of the test set forth in Sidco Paper, restrictive covenants are "'not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living.'" PharMethod, 382 F. App'x at 219 (quoting Hess, 808 A.2d at 917).

26.     "[Restrictive covenants] are closely scrutinized because Pennsylvania courts recognize 'the inherently unequal bargaining positions' of employer and employee. Id. at 219 (quoting Reading Aviation Serv., Inc. v. Bertolet, 311 A.2d 628, 630 (Pa. 1973)). A "significant hardship [ ] can result when an employee is bound by such an agreement." Id. at 219-20 (citing Morgan's Home Equip. Corp., 136 A.2d at 846).

27.      "Eliminating competition or gaining an economic advantage, however, are not legitimate business interests." Id. at 220 (citing Hess, 808 A.2d at 920-21). WCCS asserts that its legitimate interests include goodwill, trade secrets, confidential information, specialized training made available to the defendant physicians and investments it made in generating the patient referral base for the Center. Of relevance to this issue is that  OVGH - not the physician defendants - terminated the agreement with WCCS and WCCS did not show a likelihood of success on the merits with respect to the alleged violation of trade secrets or misuse of

confidential information.  The only other business interests to consider are good will, patient referral base and specialized training.  Each of these interests will be discussed.

(a)     Goodwill and Patient Referral Base

28.     Goodwill is a legitimate interest protectable by the enforcement of the confidentiality agreements.  Id.  at 221 (citing Morgan's Home Equip. Corp., 136 A.2d at 846-47).

29.     The Pennsylvania Supreme Court "has defined goodwill as that which 'represents a preexisting relationship arising from a continuous course of business . . .'"  Hess, 808 A.2d at 922 (quoting Butler v. Butler, 663 A.2d 148, 152 n.9 (Pa. 1995)).  In discussing whether goodwill is an assignable asset in the context of the sale of a business, the Supreme Court of Pennsylvania in Hess stated:

> [G]oodwill is essentially the positive reputation that a particular business enjoys. *Solomon v. Solomon,* 531 Pa. 113, 611 A.2d 686 (1992). However, where good will is intrinsically tied to single individuals, as in sole proprietorships and the like, good will often does not survive the disassociation of those individuals from the business. This type of good will, which is non-transferable and purely personal to the owner, has little value in terms of a sale of the business.

Id.

30.     WCCS argues its positive reputation created through success in the treatment of hard to heal wounds - and its commitment of resources to maintain that reputation - is a legitimate business concern in the form of goodwill.  WCCS contends that any goodwill generated by the physician defendants during their employment with or independent contractual relationships is attributed to WCCS's efforts.  WCCS points to its registered trademark, along with funds and resources it spent developing community education programs that contributed to the development

of a large patient referral base.  WCCS notes that the poster which OVGH left up is proof that

OVGH intended to continue to capitalize on the goodwill established by WCCS.   In support,

WCCS relies upon Wellspan Health, in which the Pennsylvania Superior Court affirmed a

permanent injunction against a health system's former physician-employee.  The reliance upon

Wellspan Health is misplaced.  In that case the trial court had already granted in part and denied

in part a motion for a preliminary injunction and needed to determine whether to impose a

permanent injunction.  "[A] permanent injunction does not require a showing of irreparable harm

or the need for immediate relief."  Wellspan Health, 869 A.2d at 995.  "Rather, the plaintiff must

how that an actual substantial injury has occurred and /or is threatened in the future."  Id.

31.      WCCS's position implies that the efforts of OVGH and the physician defendants did not

contribute to the goodwill or the patient referral base existing at the concurrent terminations of

the MSA with OVGH and the eight PAAs with the physician defendants.  OVGH and the

physician defendants correctly contend that the evidence of record does not show that any

goodwill created at the Center is solely attributed to WCCS's efforts.  Goodwill and a patient

referral base developed by a physician defendant may well be purely personal in nature and

linked to the physician's skills.  It, however, is reasonable to conclude that a patient visiting the

Center did so to ensure treatment by a practitioner skilled in wound treatment.  Several physician

defendants practiced at the Center for an extensive period of time, i.e., for fifteen to eighteen

years.  The facility in which the Center was housed was at all relevant times the physical property

of OVGH, and the physician defendants were independent contractors with OVGH and the

Center.  Those facts support the conclusion that the goodwill and the patient referral base in issue

cannot be solely attributed to WCCS.

32.     WCCS adduced evidence that referring physicians often referred patients to the Center as an entity; Sharma and Naseer, as OVGH's employees, worked at the Center until they established their individual practices; and Kosanovich testified that his billed services increased due to his affiliation with the Center.  This evidence, however, does not support the conclusion that the goodwill and patient referral base developed at the Center were solely attributed to WCCS efforts; rather, it supports the conclusion that WCCS, OVGH and the physician defendants all contributed to the existence of goodwill and the patient referral base.

(b)     Specialized Training

33.     Pennsylvania courts have enforced covenants not to compete to protect specialized training.  Pa. Funds Corp. v. Vogel, 159 A.2d 472, 475 (Pa. 1960) (awarding injunctive relief of a covenant not to compete where the former employer "expanded considerable money and time…in maintaining an extensive and continuous training program").

34.     WCCS argues that enforcement of the covenants not to compete is necessary because it lacks other means to protect its legitimate business interests in the specialized training it provides absent enforcement.  The issue here, however, is whether the training was unique and continuous.  WCCS notes that it makes available webcasts of training sessions for further instruction on WCCS's approach to wound care to any physician practicing at a wound care center operated by WCCS or its affiliates.  The physician defendants testified that the value of this training was minimal because they received it in other venues.  Several physician defendants characterized the training as a refresher course and something they did not refer to in actually treating patients.  The evidence of the continuous nature of the training was minimal.  Under

these circumstances, the likelihood of success with respect to the specialized training is not substantial.

iv.    Geographic and Temporal Scope

35.    Enforceable restrictive covenants include reasonable geographical restrictions. PharMethod, 382 F. App'x at 220 ("Courts uphold agreements lacking geographic limits, or with very broad geographic limits, only where the employee's duties and customers were equally broad.") (citing Quaker Chem. Corp. v. Varga, 509 F.Supp.2d 469, 476 (E.D. Pa.2007)).

36.    "The burden is on the employee to demonstrate that the non-compete covenant is 'unreasonable[ ].'" Quaker Chemical Corp., 509 F. Supp.2d at 476 (quoting John G. Bryant Co. v. Sling Testing & Repair, Inc., 369 A.2d 1164, 1169 (1977)).  "This burden is 'particularly heavy,' as 'the determination of reasonableness is a factual one, requiring consideration of all the facts and circumstances.'"  Id. (quoting Victaulic Co., 499 F.3d at 235, which quoted WellSpan Health, 869 A.2d at 999).

37.    "[A] court of equity may 'blue pencil' [the provisions of a restrictive covenant which are broader than necessary to protect the employer] by granting enforcement that is limited to those portions of the restrictions which are reasonably necessary for the protection of the employer.. . . [O]ver-breadth suggests 'an intent to oppress the employee and/or to foster a monopoly, either of which is an illegitimate purpose.'"  PharMethod, 382 F. App'x at 220 (quoting Sidco Paper, 351 A.2d at 254, 257).

38.    WCCS argues that the geographic and temporal scopes of the covenants not to compete are reasonable - one year and a twenty-mile radius of the Center - to protect WCCS from the

potential for disclosure or use of confidential information and for protection of goodwill, patient referral base, and the training that it provided to the physician defendants.

39.    Defendants correctly argue the restriction cannot be read to apply when the Center no longer exists.  When the Center no longer operates, there is no purpose to the covenant or the geographic scope because there is no location from which to determine the twenty-mile radius. See 15 GRACE MCLANE GIESEL, Corbin on Contracts § 80.9 (revised ed. 2003) (citing Gibson v. Eberle, 762 P.2d 777, 779 (Colo. App. 1988) (court determined a covenant not to compete was unenforceable after a business ceased to exist; "When the business was liquidated and its good will abandoned, the purpose for the continuation of the covenant's existence was extinguished. Thereafter, enforcement of the covenant became unreasonable as an unnecessary restraint of trade."); see also Alvino v. Carraccio, 162 A.2d 358 (Pa. 1960) (stating that doctrine of frustration of contractual purpose exists in Pennsylvania) (citing Greek Catholic Congregation of Borough of Olyphant v. Plummer, 12 A.2d 435, 439 (Pa. 1940) ("the doctrine of frustration . . . holds that under the implied condition of the continuance of a contract's subject matter, the contract is dissolved when the subject matter is no longer available.") (internal quotation omitted); RESTATEMENT OF CONTRACTS (Second) § 263 ("If the existence of a specific thing is necessary for the performance of a duty, its failure to come into existence, destruction, or such deterioration as makes performance impracticable is an event the non-occurrence of which was a basic assumption on which the contract was made.").  Under the circumstances, where the Center no longer exists, the restrictive covenant cannot be enforced against the physician defendants. Enforcement of the twenty-mile radius from the former location of the Center no longer has a purpose and it would be unreasonable to interpret the contractual agreement between the parties

to require enforcement when there is no Center to protect.  Enforcement would be limited to situations where the Center was operating and a physician defendant engaged in conduct reasonably prohibited by the PAA.  Under the circumstances of this case, WCCS did not show a likelihood of success on the merits with respect to enforcement of the geographic and temporal scopes of the parties' restrictive covenants.

        C.      Second Factor - Irreparable Harm

40.     Under Pennsylvania law "'[a]n injury is regarded as 'irreparable' if it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard.'"  West Penn Specialty MSO, Inc. v. Nolan, 737 A.2d 295, 299 (Pa. Super. Ct. 1999) (quoting Sovereign Bank v. Harper, 674 A.2d 1085, 1091 (Pa. Super. Ct. 1996.));

41.     "'[T]he nature of the term 'irreparable harm' makes it difficult to define every situation the term encompasses.'"  Ford Motor Co. v. Ins. Comm'r of Pa., 874 F.2d 926, 935 (3d Cir. 1989) (quoting Sullivan v. City of Pittsburgh, 811 F.2d 171, 179 (3d Cir. 1987) which cites Trainor v. Hernandez, 431 U.S. 434, 442 n. 7 (1977)); Bimbo Bakeries, 613 F.3d at 118.  ("Irreparable harm" results when a party is put at a "competitive disadvantage that a legal remedy could not redress.").  WCCS argues that it would be irreparably harmed if the physician defendants use its confidential information and the restrictive covenants are not enforced.

        a.      Confidential Information

42.     WCCS argues that a temporary restriction on the physician defendants is warranted in this case because the injunction it seeks is narrowly tailored to protect its confidential information, which includes its trade secrets, and that WCCS would suffer greater irreparable harm absent the restriction by use of its confidential information at the same location where the Center was

formerly located in connection with or for a WCCS competitor.  As discussed above, WCCS did not show a likelihood of success in proving that the information it requests to be protected is of a confidential nature.  Absent a finding of the need to protect confidential information, the court cannot find that WCCS showed it would suffer irreparable harm with respect to the physicians defendants' alleged disclosure or use of the information.

b.    Restrictive Covenants

43.    WCCS argues that a temporary restriction on the physician defendants is warranted in this case because the injunction it seeks is narrowly tailored to protect its legitimate interests - including training provided to the physician defendants and the Center's established patient referral base - and that WCCS would suffer greater irreparable harm absent the restriction by injury to its goodwill at the same location in connection with or for a WCCS competitor.  As discussed above, WCCS did not show a likelihood of success that its legitimate business interests include all the training physician defendants received from WCCS, the information contained in the CPGs, its patient referral base or other goodwill allegedly attributed solely to WCCS's efforts.  Harm caused to WCCS does not arise solely from the defendant physicians' conduct, but is more directly attributable to OVGH's termination of the MSA and the identification of the physician defendants to be part of the panel chosen by National.  The equities of this matter are mitigated in favor of the physician defendants because WCCS did not offer to contract with any defendant physician to provide services at other centers operated by WCCS.

44.    Defendants correctly argue that WCCS cannot convert any lost business advantages that WCCS could have sold to other hospitals, if the eight physician defendants were not practicing

with OVGH at the new center operated by National, into irreparable damages. "[A] plaintiff in a breach of contract case cannot convert monetary harm into irreparable harm simply by claiming that the breach of contract has prevented it from performing contracts with others and that this subsequent failure to perform will harm the plaintiff's reputation." Bennington Foods LLC v. St. Croix Renaissance Grp, LLP, 528 F.3d 176, 178-79 (3d Cir. 2008) (citing Frank's GMC Truck Center, Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir.1989) ("[t]he availability of adequate monetary damages belies a claim of irreparable injury"); In re Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1145 (3d Cir.1982) ("[W]e have never upheld an injunction where the claimed injury constituted a loss of money, a loss capable of recoupment in a proper action at law").

45.     As noted above, the parties agree the market for non-healing wound treatment is far more competitive now than when the Center opened in 1992. More hospitals have entered into that market. WCCS's contention that it will be irreparably harmed by loss of its patient referral base from repeat visits by diabetic patients who tend to have recurring non-healing wounds is not persuasive. The record reflects that the harm suffered by WCCS when Adoki left the Center was primarily monetary in nature. WCCS did not adduce any evidence to show the harm it would suffer with respect to the physician defendants practicing the treatment of non-healing wounds at the former location of the Center is other than money. Under these circumstances, the court cannot find that WCCS showed it would suffer irreparable harm absent enforcement of the restrictive covenants set forth in the PAAs.

D.    Third Factor - Granting Relief Will Not Result in Even Greater Harm to the Nonmoving Party

a.    Confidential Information

46.    WCCS claims that prohibiting OVGH and the defendant physicians from disclosing WCCS's confidential information, which includes trade secrets, will not result in even greater harm to OVGH and the defendant physicians.   Because WCCS did not show a likelihood of success on the merits with respect to the confidential nature of any information it seeks to prohibit OVGH and the defendant physicians from disclosing, WCCS cannot show that granting relief would not result in even greater harm to the nonmoving parties - defendants.   Each physician defendant signed an acknowledgment that he or she would not disclose any of WCCS's information that is confidential.  There was no showing that any physician defendant disclosed any confidential information.  Under these circumstances, the court cannot conclude that this factor favors WCCS with respect to the requested relief concerning an injunction to protect alleged confidential information.

b.    Restrictive Covenants

47.    WCCS claims that the restrictive covenants do not keep the physician defendants from practicing medicine unreasonably and do not restrict OVGH from contracting with a competitor to WCCS to offer wound care services.  WCCS maintains that the restrictive covenants affect the physician defendants only minimally by prohibiting them from providing wound care services in connection with any entity for one year within twenty miles of the Center, but does not restrict their general practice of medicine within or without the restricted area or restrict them from providing wound care services outside the restricted area.  WCCS contends the restrictive

covenants affect OVGH only minimally because OVGH is not restricted from contracting with a competitor of WCCS to offer wound care services.

48.     While there may be some merit to WCCS's contention, the court cannot agree.  The geographic restriction is not enforceable because the Center no longer exists and WCCS did not show a likelihood of success on the merits.  A physician defendant's livelihood depends upon practicing medicine.  WCCS did not show intent to reestablish an alternative wound care center at a location separate and apart from OVGH that would directly compete with OVGH within a twenty-mile radius of OVGH.  Under these circumstances, this factor has little weight.

                    E.      Fourth Factor - The Public Interest

                            a.      Confidential Information

49.     WCCS argues that the public interest would not be negatively affected by prohibiting OVGH and the physician defendants from disclosing WCCS's confidential information, which includes trade secrets.  As discussed above, because WCCS did not show a likelihood of success on the merits with respect to the confidential nature of any information they seek to prohibit defendants from disclosing, the public interest would not be served by granting WCCS's requested relief.  Similarly, the lack of evidence to show a violation of the acknowledgements signed by each defendant physician that he or she would not disclose any of WCCS's information that is confidential mitigates against finding that this factor favors WCCS.  Under these circumstances, the court does not afford any weight to this factor with respect to any alleged confidential information.

b.     <u>Restrictive Covenants</u>

50.     In considering the interest of the public in the context of whether to enforce covenants

restricting the practice of physicians, courts in Pennsylvania look to the effect on the patient

community, and whether there would be a shortage of physicians or specialists in the area such

that "the potential pool of clients far exceeds the…ability to serve them." <u>New Castle</u>

<u>Orthopedic Assoc. v. Burns,</u> 392 A.2d 1383, 1387 (Pa. 1978) (measuring public interest as a

quantitative sufficiency of physicians practicing in the restricted area); <u>W. Penn Specialty MSO</u>,

737 A.2d at 301-01 ("In the context of non-compete agreements amongst physicians, our

Supreme Court has defined the public interest as a function of the availability of appropriate

medical service to the community should an injunction be imposed.").  In discussing the public

interest factor, the Supreme Court of Pennsylvania in <u>New Castle Orthopedic</u> stated:

> Paramount to the respective rights of the parties to the covenant
> must be its effect upon the consumer who is in need of the service.
> This is of particular significance where equitable relief is being
> sought and the result of such an order or decree would deprive the
> community involved of a desperately needed service.

<u>New Castle Orthopedic</u>, 392 A.2d at 1387-88.

        WCCS argues that the public interest will not be negatively affected considering the

limited nature of the injunctive relief sought and that there are numerous competitors located

near the restricted area.  WCCS notes that OVGH is not precluded from operating a wound care

center, and that the physician defendants are not precluded from providing wound care services

outside the restricted area  - provided they do not use or disclose WCCS's confidential

information - but only from providing wound care services within twenty miles of the former

Center for a period of one year.

Defendants argue that patients with recurring, non-healing wounds do not have the option of elective treatment and patients are likely to seek treatment in close proximity to their homes, provided by physicians with whom they are familiar. WCCS did not show that the entry of an injunction would have minimal effect. Scant evidence was adduced on this matter. The court is unable to conclude that this factor favors WCCS. It is unclear whether patients seeking services from a wound care center who have ongoing special heath care needs related to other potentially unstable medical conditions, such as diabetes and kidney dialysis, would be adversely affected by the injunction.

## III.    Conclusion

After considering all four factors, the preliminary injunction requested by plaintiffs Wound Care Centers, Inc. and Diversified Clinical Services, Inc. cannot be granted. The Motion is denied with respect to the enforcement of the confidentiality provisions contained in the PAAs and the enforcement of the geographic restriction on the practices of the physician defendants. WCCS did not adduce sufficient evidence to show a likelihood of success on the merits of the claims presented or irreparable harm. The other factors do not weigh in WCCS's favor.

## ORDER

**AND NOW,** this 8th day of February 2011, pursuant to Rules 52(a) and 65 of the Federal Rules of Civil Procedure, following a hearing on August 3 and 4, 2010 and review of the parties' proposed findings of fact and conclusions of law, and for the reasons stated in the foregoing

Memorandum Opinion, it is hereby **ORDERED** and **ADJUDGED** that the motion for a

preliminary injunction (ECF No. 3) filed by plaintiffs Wound Care Centers, Inc.'s and

Diversified Clinical Services, Inc. is DENIED.


/s/  JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge
